# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

Guenter Lewy

    4101 Cathedral Ave. N.W.
Apt. 917
Washington, DC 20016-7500,

             Plaintiff,
      v.

Southern Poverty Law Center, Inc., and
David Holthouse

          Defendants.

Civil Action No.

## COMPLAINT

Plaintiff Guenter Lewy ("Plaintiff") brings this Complaint for defamation against the Southern

Poverty Law Center, Inc., and David Holthouse ("Defendants") and states the following:

## JURISDICTION AND VENUE

1.   This Court enjoys subject matter jurisdiction over this action under 28 U.S.C. §

1332(a)(1) because the Plaintiff and Defendants are citizens of different states and the

amount in controversy exceeds $75,000.

2.   This Court enjoys personal jurisdiction over the Defendants because the false and

defamatory statements made by Defendants were published in the District of Columbia,

and the Plaintiff-target of the defamatory statements was and remains a resident of the

District of Columbia.

3.  This Court enjoys venue under 28 U.S.C. § 1391(a)(2) because all or a substantial portion of the events that gave rise to Plaintiff's claims transpired in the District of Columbia, including the publication or republication of the defamatory falsehoods and the damage to Plaintiff's reputation.

## PARTIES

4.  Plaintiff, Guenter Lewy, is an emeritus professor of political science at the University of Massachusetts and author of several academic books and articles published by university presses and other reputable publishing houses, including *The Catholic Church and Nazi Germany* (McGraw Hill, 1964), *Religion and Revolution* (Oxford University Press, 1974), *America in Vietnam* (Oxford University Press, 1978), *The Nazi Persecution of the Gypsies* (Oxford University Press, 2000), and *The Armenian Massacres in Ottoman Turkey: A Disputed Genocide* (University of Utah Press, 2005).   Professor Lewy is a resident of the District of Columbia.

5.  Defendant, Southern Poverty Law Center, Inc. ("SPLC"), is a not-for-profit organization exempt from taxation according to 26 U.S.C. § 501(c)(3), and incorporated in the State of Alabama with its principal place of business in the city of Montgomery. According to its stated purposes, it is devoted to fighting all forms of discrimination and extremism, promoting tolerance, and protecting vulnerable members of society.  Among other things, SPLC publishes the *Intelligence Report*, a quarterly magazine that, according to its masthead, "is provided free of charge to law enforcement officials, journalists, scholars and others," apparently to inform them about the activities of individuals and groups that promulgate hatred and extremism.  The magazine has been published since at least 1998.

It    is    published    both    in    hard    copy    and    on    the    Internet    at www.splcenter.org/intel/intelreport/.

6.  The number of broadband subscribers in the United States with access to that website is more than 75 million according to the Organization of Economic Cooperation and Development ("OECD").    *BB-Portal Press release-June 2008,* available at http://www.oecd.org/document/10/0,3343,en_2649_34225_40652298_1_1_1_1,00.html (last visited November 7, 2008). The number of broadband subscribers in other English speaking nations with access to the magazine, according to the OECD, is the following: UK 16.7 million, Canada 9 million, Australia 4.98 million, New Zealand 853,020, and Ireland 832,590.  *Id.* According to the SPLC approximately 300,000 individuals and organizations receive the *Intelligence Report*, including recipients in the District of Columbia, whether in electronic or physical form.   According to the organization's 2007 Annual Report, SPLC's endowment fund is valued at over $201 million, and the SPLC spent over $20 million on programs during the same year.

7.  David Holthouse is Associate Editor of the *Intelligence Report* and author of the cover story of the Summer 2008 issue entitled, "State of Denial: Turkey Entices U.S, Scholars, Law Makers to Cover Up Armenian Genocide."[1] Defendant Holthouse resides in Alabama.

<u>STATEMENT OF FACTS</u>

8.  Since the conclusion of World War I and the disintegration of the Ottoman Empire, an historical and legal controversy has raged over whether, in the context of war and an

---

[1] The online edition of the article contains the slightly different title, "State of Denial:  Turkey Spends Millions to Cover Up Armenian Genocide."  *See*  http://www.splcenter.org/intel/intelreport/article.jsp?aid=935.

undeniable Armenian rebellion against the Ottoman government in favor of its enemies, the deaths of a large number of Ottoman Armenians as a result of combat, disease, starvation, exposure, and massacre constituted the crime of genocide.[2]  At present, those who dispute that the genocide label is apt are characteristically maligned by those who favor the genocide thesis as indistinguishable from "Holocaust deniers" who are either bigoted against Armenians or Christians or are on the Turkish government payroll.  Little solace can be derived from the fact such current intimidations mark an improvement from earlier decades.  Then, those who defended the contra-genocide thesis could expect physical assaults or even assassination attempts.  Stanford Shaw, a tenured professor of history at Harvard and then U.C.L.A., for instance, had his house firebombed while he and his family slept on October 3, 1977 in retaliation for theorizing in his work, *History of the Ottoman Empire and Modern Turkey*, that because the Ottoman Armenians had revolted against the government in 1915, their removal from the war zone along the Russian frontier was justifiable.   From the 1970s -1990s, Armenian terrorist organizations, such as the Armenian Secret Army for the Liberation of Armenia ("ASALA") and the Justice Commandos of the Armenian Genocide ("JCAG"), perpetrated hundreds of terrorist acts against Turkish officials, Turkish buildings, Turks, and Turkish Americans to avenge the alleged genocide.  The Federal Bureau of Investigation's "Chronological List of Terrorist Incidents in the United States 1980-

---

[2] Genocide did not become a legally cognizable, distinct crime until the post-World War II Nuremberg trials. Shortly thereafter it was codified in the United Nations Convention on the Prevention and Punishment of the Crime of Genocide, which was adopted by the U.N. General Assembly on December 9, 1948 and entered into force on January 12, 1951.  78 U.N.T.S. No. 1021, p. 277 (1951) (the "U.N. Genocide Convention").  The U.S. Senate has ratified the convention and the United States has enacted laws to give it effect. *See* 18 U.S.C. §§ 1901, 1902, also known as the Proxmire Act, as amended by PL 110-151 (2007), also known as the Genocide Accountability Act. Though Turkey is a member of the U.N. Genocide Convention, no party has ever raised the Armenian allegation of genocide against Turkey under the terms of the Convention, including before the International Court of Justice.

2005" contains no fewer than ten such attacks *on U.S. soil*. U.S. Department of Justice, Federal Bureau of Investigation, *Terrorism 2002-2005*, available at http://www.fbi.gov/publications/terror/terrorism2002_2005.htm (last visited November 6, 2008). The terrorists were generally celebrated as heroes by other Armenians. For example, to show "moral support" for Hampig Sassounian, who was convicted for the murder of Turkish diplomat Kemal Arikan in Los Angeles, an "Evening for Hampig" was organized by the "Sassounian Defense Committee" and held at the Holy Cross Armenian Apostolic Church in Montebello, California on October 21, 1983. The event included a special church service presided over by a bishop, as well as presentations by Armenian artists and singers. *The Armenian Observer*, October 12, 1983: p.3. *See More than $70,000 raised for Hampig Sassounian Defense Effort*, Asbarez, Feb. 25, 2002, available at http://www.asbarez.com/index.html?showarticle=11236_02/25/2002_1.

9. Plaintiff bravely acted pursuant to the highest standards of scholarly integrity in his research, writing, and speaking about the fate of the Ottoman Armenians in the midst of a climate hostile to open inquiry and debate.

10. Born in Breslau, Germany (now Wroclaw, Poland), in 1923, Plaintiff was physically beaten during the infamous *Kristallnacht* pogrom of November 9-10 of 1938, which had engulfed the city. Plaintiff fled to Palestine in March of 1939 following harassment and intimidation by Nazi supporters.

11. Plaintiff volunteered for the British Army in December 1942 and fought against fascist German and Italian forces in Italy as a member of the Jewish Brigade, which formed part of Montgomery's 8th Army.

12. Following the war, in 1946 Plaintiff moved to the United States.  He studied at the City College of New York and then at Columbia University, which awarded him a Ph.D in 1957. Plaintiff became a professor of political science and taught courses on American civil liberties at both Smith College and the University of Massachusetts. He also served as an official of the Hampshire County branch of the American Civil Liberties Union.

13. Plaintiff has authored numerous books and articles including works on the tragic history of Gypsies in Nazi-occupied Europe, Native Americans, and the Ottoman Armenians.  . In 2005, Plaintiff authored *The Armenian Massacres in Ottoman Turkey: A Disputed Genocide* on his own initiative.  It was not written at the request of the Government of Turkey or any other person.  The book mainly constitutes a historiography of the rival theses in the genocide controversy.  In part Plaintiff disputes the prevailing Turkish view of the evidence of an Armenian genocide.  He wrote, for instance, "Even if Turkish allegations of wholesale disloyalty, treason and revolt were true, they are totally insufficient as a justification for what was done to the Armenians."  Lewy*, Armenian Massacres in Ottoman Turkey: A Disputed Genocide*  95 (2005).  Plaintiff added, "The Turkish side, which seeks to dismiss the killings as 'excesses' or 'intercommunal warfare' and often speaks of 'so-called massacres' therefore is distorting the historical record." *Id*. at 252.  The Plaintiff's conclusion is *emphatically not* that nothing tragic or even illegal happened to the Armenians, but that the evidence of genocide (under applicable legal standards) is unpersuasive or inconclusive based on the current store of reliable evidence.  He wrote:

> The conclusions of Gwynne Dyer, a researcher with extensive immersion in the Ottoman archives, in my view are more on the mark. Given the state of the evidence from Ottoman sources, Dyer maintains, it is impossible to prove conclusively that the Young Turk regime did not initiate a program

of deliberate genocide in the spring of 1915, 'but it seems to me most improbable that this was the case. Such a programme requires a degree of calculation and foresight which was almost entirely absent in all the other actions of the C.U.P. government in the war.' Dyer does not regard Talaat, Enver, and their associates as cruel and savage dictators who ruthlessly exploited a long-sought opportunity for a much-desired genocide. He sees them 'not so much as evil men but as desperate, frightened, unsophisticated men struggling to keep their nation afloat in a crisis far graver than they had anticipated when they first entered the war (the Armenian decisions were taken at the height of the crisis of the Dardanelles), reacting to events rather than creating them, and not fully realizing the extent of the horrors they had set in motion in 'Turkish Armenia' until they were too deeply committed to withdraw.'

I believe that the evidence I have examined and presented in this book is in line with Dyer's appraisal made more than thirty years ago. We do not know how many Armenians perished as a result of starvation and disease and how many were killed by Kurds, seeking booty and women, or by fanatic Muslims, who regarded the Armenians as infidels and traitors. For all of these occurrences the incompetent Ottoman regime bears some indirect responsibility. But there is a difference between ineptness, even ineptness that has tragic and far-reaching consequences, and the premeditated murder of a people. As we have seen, the government also badly mishandled its wounded soldiers, refugees, and prisoners of war, but one would hesitate to consider these acts of neglect and callousness a crime of equal magnitude as deliberate killing. Even the fact that some fanatic Young Turk officials welcomed the death of large numbers of Armenians is not the same as intentionally seeking and causing such deaths.

It is impossible to ignore the horrors to which the Armenians were subjected, but it is important to see these terrible events in their proper historical context. The order for the deportation of the Armenian community was issued at a time of great insecurity, not to say panic, which made any calm calculation of possible consequences difficult and unlikely. Any full discussion of the events of 1915-1916 also cannot ignore the impact of the loss of Van and the displacement of large numbers of Muslims in eastern Anatolia, who were forced to flee for their lives in the face of the advancing Russian armies and their Armenian helpers. This dislocation sharply increased hostility toward the Armenians among the Muslim population of the empire and added to the tensions created by charges of Armenian treason. The fear that the Armenian population constituted a fifth column may have been exaggerated, but it did have some basis in fact. While the Armenians were victims, not all of them were innocent victims; and the disaster that overtook them therefore was not entirely unprovoked. Most importantly, while the Ottoman

government bears responsibility for the deportations that got badly out of hand, the blame for the massacres that took place must be put primarily on those who did the actual killing."

*Id*. at 256-257.

14.  Other reputable American scholars who question the appropriateness of the genocide label for the tragic events of 1915-1916 include famed Middle East expert Bernard Lewis of Princeton University, the late Stanford Shaw of U.C.L.A., Justin McCarthy of the University of Louisville, Norman Itzkowitz of Princeton University, Brian G. Williams of the University of Massachusetts, David Fromkin of Boston University, Avigdor Levy of Brandeis University, Michael M. Gunter of Tennessee Tech, Pierre Oberling of Hunter College, the late Roderic Davison of George Washington University, Michael Radu of Foreign Policy Research Institute,  and military historian Edward J. Erickson.  Outside of the United States yet more scholars have endorsed a contra-genocide analysis of the history of the Ottoman Armenians, among them Gilles Veinstein of the College de France, Stefano Trinchese of the University of Chieti, Augusto Sinagra of the University of Romae-Sapienza, Norman Stone of Bilkent University, and the historian Andrew Mango of the University of London.

15. Plaintiff has actively maintained his independence from Turkish nationalist persuasion. In November 2005, Plaintiff was invited by Gazi University in Ankara, Turkey to present a paper at an International Symposium on the "Development of Turkish-Armenian relations and the Events of 1915."   After attending, Plaintiff concluded that the conference had diverged into more of a political rally than a scholarly enterprise, and thus withdrew his paper from publication, writing to Professor Hale Sivgin, Director, Ataturk Research Center, Gazi University on November 30, 2005.  Exhibit 1.

16. The Summer 2008 issue of SPLC's *Intelligence Report* featured an article by Defendant Holthouse entitled, "State of Denial: Turkey Entices U.S, Scholars, Law Makers to Cover Up Armenian Genocide" that addressed the Armenian allegation of genocide. Exhibit 2. An editorial in the same issue, entitled, "Lying About History," also addressed the matter, making negative reference to the Plaintiff. On information and belief, the *Intelligence Report* has never published any other article that addresses the Armenian allegation of genocide.

17. The Holthouse article asserted as fact, among other things: "Lewy is one of the most active members of a network of American scholars, influence peddlers and website operators, financed by hundreds of thousands of dollars each year from the government of Turkey, who promote the denial of the Armenian genocide…." Defendant Holthouse also asserted as facts: "Lewy makes similar revisionist claims in his 2005 book *The Armenian Massacres in Ottoman Turkey:  A Disputed Genocide* and in frequent lectures at university campuses across the country…Revisionist historians who conjure doubt about the Armenian genocide and are paid by the Turkish government provided politicians with the intellectual cover they needed to claim they were refusing to dictate history rather than caving in to a foreign government's present-day interests."

18. The Statements referenced in paragraph 17 (hereinafter "Statements") assert or imply the following acts of moral turpitude: (a) that Plaintiff has and continues to compromise his scholarship on the fate of the Ottoman Armenians and disputes the genocide characterization of the events of 1915-1916 in exchange for money from the Government of Turkey; (b) that Plaintiff deceives his readers and audiences when he addresses the controversy surrounding the Armenian allegation of genocide by concealing his receipt of

money from the Government of Turkey; and, (c) that Plaintiff is guilty of a criminal violation of the Foreign Agents Registration Act of 1938, 22 U.S.C. § 611 et seq., by failing to register with the United States government as an agent of the Republic of Turkey as he is a paid mouthpiece of the government of Turkey, even though, as averred above, Plaintiff is a critic of important elements of the prevailing Turkish viewpoint in the controversy.

19. The Statements, individually and taken as a whole in context of the article and the issue of the *Intelligence Report* in which they appear, are defamatory because they falsely impute to Plaintiff academic corruption, fraud and deceit, as well as the commission of a criminal offense, in a manner ruinous to the reputation and esteem of Plaintiff professionally, locally, nationally, and globally. The Statements proximately caused Plaintiff general and special damages in the form of injury to his reputation throughout the United States and internationally. These damages include, but are not limited to, Plaintiff's scholarly credibility being compromised, loss of speaking invitations, loss of teaching and book publishing opportunities, loss of book sales, and emotional and psychological trauma and suffering.

20. The acute stigma attached to failures to disclose the receipt of money or its equivalent that could distort academic or professional judgments finds expression in a welter of government conflict-of-interest regulations and financial disclosure standards embraced by highly respected professional publications, including the Food and Drug Administration,[3] National Institutes of Health,[4] The New England Journal of Medicine,[5] and the Journal of the American Medical Association.[6]

---

[3] http://www.fda.gov/oc/advisory/GuidancePolicyRegs/ACWaiverCriteriaFINALGuidance080408.pdf
[4] http://grants.nih.gov/grants/peer/COI_Information.pdf

21. In all academic fields, but perhaps most significantly in the study of historical controversies such as the Armenian allegation of genocide, a scholar's credibility and standing is demolished by an allegation of receiving payment from one side of the argument to arrive at a pre-established conclusion either affirming or denying that the historical event at issue constituted genocide within the accepted scholarly and legal definition of the term.

22. The Statements, therefore, severely injured Plaintiff's reputation as a scholar, especially in certain circles, with the accusation in substance that Plaintiff was a "scholar for hire" by the government of Turkey.

23. By publishing the Statements in hard copy and on the Internet in the *Intelligence Report*, Defendants knew it would be republished and read by the general public throughout the United States and elsewhere.  The Statements were in fact republished and read by members of the general public throughout the United States and elsewhere as a direct, natural, probable, and foreseeable consequence of Defendants' publication and subsequent republication.

24. By publishing the Statements, Defendants intended to, and did charge Plaintiff with the commission of a crime under the Foreign Agents Registration Act of 1938, 22 U.S.C. § 611 et seq.

25. The Statements stigmatize Plaintiff as guilty of academic fraud and deceit and injure his professional standing.

---

[5] http://content.nejm.org/cgi/reprint/345/11/825.pdf
[6] http://jama.ama-assn.org/misc/i4a.pdf

26. The Statements individually and collectively are false, and were false when made. The Statements are defamatory falsehoods, which Defendants knew or should have known were false when made.

27. Defendants made the Statements with actual malice and wrongful and willful intent to injure Plaintiff.  The Statements were made with reckless disregard for their truth or falsity or with knowledge of their falsity and with wanton and willful disregard of the reputation and rights of the Plaintiff.

28. Defendants lacked reasonable grounds for making the Statements.

<u>COUNT I- DEFAMATION PER SE</u>

29.  Plaintiff incorporates by reference into this Count all of the allegations appearing in paragraphs 1-28 appearing in this Complaint.

30. The Statements impute to Plaintiff a criminal violation of the Foreign Agents Registration Act of 1938 for which, if true, he may be punished by a fine and up to six months imprisonment. The publication and republication of the Statements proximately caused general and special damages to Plaintiff.  Defendants knew, anticipated, foresaw, and intended that the Statements would be read by persons throughout the United States and the world and would damage the reputation of the Plaintiff.  The Statements have adversely affected Plaintiff's scholarly credibility, speaking, writing, and publishing opportunities, book sales, and caused psychological and emotional trauma and suffering.

<u>COUNT II-DEFAMATION PER SE</u>

31.  Plaintiff incorporates by reference into this Count all of the allegations appearing in paragraphs 1-30 of this Complaint.

32. The Statements, individually and collectively, referred to herein have caused, are causing, and will cause Plaintiff to suffer injury to his professional standing, to his reputation and good name; and, they have held and will continue to hold Plaintiff up to public scandal and ridicule.  The Statements were calculated to, and do, expose Plaintiff to public scorn, hatred, and ridicule.  By such published Statements, Defendants did injure the Plaintiff's reputation within his professional circles and in the community at large.  The publication of the Statements proximately caused general and special damages to the Plaintiff.  The Statements have adversely impacted Plaintiff's scholarly credibility, and opportunities for writing, teaching, speaking, and book sales.  The Statements have damaged Plaintiff's professional standing in the academic community.  The Statements have proximately caused Plaintiff emotional and psychological trauma and suffering which is continuing.

<u>PRAYER FOR RELIEF</u>

33.  Plaintiff demands judgment against Defendants, jointly and severally, as follows:  (i) for compensatory damages in the amount of $2 million ($2,000,000) on Count I and $2 million ($2,000,000) on Count II; (ii) punitive damages in the amount of $2 million ($2,000,000) on Count I and $2 million ($2,000,000) on Count II; (iii) both pre-judgment and post-judgment interest on both Counts; and, (iv) such other and further relief as this Court finds just and equitable.

<u>JURY TRIAL</u>

Plaintiff demands a jury trial.

Respectfully submitted,

/s/
_____
Bruce Fein
DC Bar #446615

1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C. 20036
Mobile:  703-963-4968
Office:  202-370-1399
Facsimile:  202-448-1664
Email:  triumphent@aol.com


/s/
_____
David Saltzman
DC Bar #426201
655 15th Street, NW
Suite 225-F
Washington, DC 20005-5701
Office:        202-637-9877
Mobile:        202-550-2007
Facsimile:        202-637-9876
Email:  dsaltzman@turklaw.net