# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GUENTER LEWY,

     Plaintiff,

     v.

SOUTHERN POVERTY LAW CENTER,
INC., *et al.*,

     Defendants.

Civil Action No. 08-1971 (CKK)

## MEMORANDUM OPINION
(July 13, 2010)

Plaintiff Guenter Lewy filed the above-captioned case against Defendants David

Holthouse ("Holthouse") and Southern Poverty Law Center, Inc. ("SPLC") alleging that they

wrote and published defamatory statements that caused him various injuries including

reputational  harm and emotional trauma.  In response to Plaintiff's Amended Complaint,

Defendants filed a Motion to Dismiss for lack of personal jurisdiction pursuant to Federal Rule

of Civil Procedure 12(b)(2).  This Court denied that motion without prejudice and granted

Plaintiff's Motion for Jurisdictional Discovery to allow Plaintiff to discover facts relating to each

Defendant's connection to the District of Columbia.  *See* Order (June 18, 2009), Docket No.

[24].  Now that jurisdictional discovery has been completed, the parties have filed supplemental

briefs on the issue of personal jurisdiction, and the Court shall now reconsider Defendants' [7]

Motion to Dismiss.

For the reasons explained below, the Court shall GRANT-IN-PART Defendants' Motion

to Dismiss with respect to Defendant Holthouse and DENY-IN-PART with respect to Defendant

Southern Poverty Law Center, Inc.

## I.  LEGAL STANDARD

Defendants have moved to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  A plaintiff bears the burden of establishing a factual basis for asserting personal jurisdiction over a defendant.  *See Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).  Accordingly, a plaintiff must present evidence of specific facts establishing a prima facie case that personal jurisdiction exists.  *Naegele v. Albers*, 355 F. Supp. 2d 129, 136 (D.D.C. 2005); *see also Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001).  "To make such a showing, the plaintiff is not required to adduce evidence that meets the standards of admissibility reserved for summary judgment and trial; rather she may rest her arguments on the pleadings, 'bolstered by such affidavits and other written materials as [she] can otherwise obtain.'"  *Urban Institute v. FINCON Servs.*, 681 F. Supp. 2d 41, 44 (D.D.C. 2010) (quoting *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005)).  In contrast to a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the Court need not treat all of a plaintiffs' allegations as true when determining whether personal jurisdiction exists over a defendant.  Instead, the Court "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts."  *United States v. Phillip Morris, Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000) (citation omitted).  Nevertheless, the Court must resolve any factual discrepancies with regard to the existence of personal jurisdiction in favor of the plaintiff.  *See Crane*, 894 F.2d at 456.

## II.  FACTUAL BACKGROUND

The following facts are drawn from the allegations in the Amended Complaint and the

affidavits and other evidence presented by the parties in their briefs on the issue of personal jurisdiction.

A.      *Claims Asserted in the Amended Complaint*

Plaintiff Guenter Lewy is an emeritus professor of political science at the University of Massachusetts and a resident of the District of Columbia.  Am. Compl. ¶ 12.  A survivor of German violence against Jews during World War II, Prof. Lewy has written numerous books and articles about the history of persecuted peoples such as the Gypsies in Nazi-occupied Europe, the Native Americans, and the Ottoman Armenians.  *See id.* ¶¶ 18, 21.  In 2005, Prof. Lewy authored a book entitled *The Armenian Massacres in Ottoman Turkey: A Disputed Genocide* (Univ. of Utah Press 2005) which discusses the atrocities committed against Armenians by the Ottoman Turks in 1915-16 and the debate in the historical community about whether to label those atrocities a "genocide."  *Id.* ¶ 21.  Prof. Lewy ultimately concludes in the book that the current, reliable evidence of genocide is unpersuasive or inconclusive.  *Id.*  Prof. Lewy contends that many other reputable American scholars have questioned the propriety of the genocide label.  *Id.* ¶ 22.

Defendant Southern Poverty Law Center, Inc. ("SPLC") is a not-for-profit organization incorporated in Alabama devoted to fighting discrimination and extremism.  Am. Compl. ¶ 13. SPLC publishes a quarterly journal entitled *Intelligence Report* that is provided free of charge and discusses the activities of individuals and groups that promote hatred and extremism.  *Id.* The *Intelligence Report* is published both in hard copy and on the internet at SPLC's website.  *Id.* Defendant David Holthouse is Senior Editor of the *Intelligence Report*.  *See* Defs.' Supp. Mem., Ex. 4 (Dep. of David Holthouse) at 8.

In the summer of 2008, Holthouse authored a cover story for the *Intelligence Report* entitled "State of Denial: Turkey entices U.S. scholars, lawmakers to cover up Armenian genocide." *Id.* ¶ 24; *see also* Compl., Ex. 2 (excerpts from Summer 2008 issue of *Intelligence Report*).[1]  Holthouse's article discusses efforts by Turkey to deny the existence of the Armenian genocide and criticizes the work of scholars such as Lewy who dispute the existence of a genocide.  *See generally* Compl., Ex. 2.  Specifically, the "State of Denial" article asserts that "Lewy is one of the most active members of a network of American scholars, influence peddlers and website operators, financed by hundreds of thousands of dollars each year from the government of Turkey, who promote the denial of the Armenian genocide . . . ."  Am. Compl. ¶ 25.  The article describes Lewy as a "revisionist historian" and features a picture of him.  *See* Compl., Ex. 2.  The Summer 2008 issue of the *Intelligence Report* also features an editorial captioned "Lying About History" that criticizes Lewy.  *Id.*; Am. Compl. ¶ 24.

Lewy claims that the statements made in the *Intelligence Report* are defamatory because they falsely accuse him of corruption, fraud, and even commission of a crime under the Foreign Agents Registration Act of 1938, 22 U.S.C. §§ 611-21.  *See* Am. Compl. ¶¶ 27-33.  Lewy claims that the statements damaged his reputation as a scholar, diminished his opportunities for teaching and speaking, hurt his book sales, and caused him emotional trauma and suffering.  *Id.* ¶ 27.  Lewy seeks compensatory and punitive damages totaling $8 million.  *Id.* ¶ 41.

B.      *SPLC's Connections with the Forum*

Plaintiff asserts that SPLC has numerous connections with this forum, the District of

---

[1] There are several different subtitles for the "State of Denial" article; the one quoted above is from the cover of the Summer 2008 issue of *Intelligence Report*.  *See* Compl., Ex. 2.

Columbia.  Although SPLC is a non-profit corporation residing in Alabama, it operates a website

on the internet that is accessible to D.C. residents.  *See* Southern Poverty Law Center,

http://www.splcenter.org.  Visitors to the SPLC website can enter their email address and

subscribe to the organization's newsletters, such as "Hate Watch Weekly" and "Nativism in the

News."  *See* Pl.'s Mem., Ex. 1 (Dep. of Mark Potok) at 31-34.  These newsletters are distributed

electronically to thousands of subscribers.  *See id.* at 33.  Visitors to the website can also request

additional information about SPLC, make a charitable donation, and comment on postings on the

SPLC's weblog.  *See* Pl.'s Mem., Ex. 2 (SPLC's Responses to Interrogatories) at 18.  Unless a

website visitor requests certain information or makes a donation, SPLC does not keep track of

the visitor's geographic location.  *Id.*  Since 2005, SPLC has collected 541 email addresses from

donors who provided a District of Columbia address, and SPLC sent approximately 82 emails to

its donors between 2005 and 2008 relating news about its activities.  *Id.*  The SPLC website also

contains an interactive feature called "Stand Strong Against Hate" that encourages visitors to

email SPLC their contact information to indicate their desire to promote tolerance; SPLC then

places those visitors' names on a digital map of the United States indicating their location.  *See*

Stand Strong Against Hate, http://www.splcenter.org/center/petitions/standstrong; Pl.'s Mem. at

5.  According to documents produced during jurisdictional discovery, at least 117 District of

Columbia residents have signed the "Stand Strong Against Hate" online petition.  *See* Pl.'s

Mem., Ex. 7 ("Stand Strong Against Hate DC Signers").  The website also invites law

enforcement groups to sign up for SPLC-led training programs.

     In 2008, SPLC received $29,118 in online donations from 133 different donors based in

the District of Columbia.  *See* Pl.'s Mem., Ex. 5 ("DC Unique Donor and Revenue Count by ZIP

(Web Gifts Only)"). In 2007, SPLC received $24,654 in online donations from 106 separate donors in D.C. *Id.* From 2000-2008, the total amount of internet contributions received from District of Columbia donors was over $92,000 from 446 separate donations. *Id.* SPLC places its online donors in a regular solicitation program in which it sends mail to donors encouraging them to renew their membership and donate additional funds. *See* Pl.'s Mem., Ex. 6 (Dep. of Wendy Via) at 16-17. SPLC also regularly solicits donations from D.C. residents. *See* Pl.'s Mem., Ex. 8 ("DC Solicitations by ZIP Code"). These solicitations are done by mail to individuals and organizations. Defs.' Supp. Mem., Ex. 5 (Aff. of Wendy Via) ¶ 5. SPLC made 84,828 solicitations to D.C. residents in 2008 and 95,582 solicitations in 2007. *See* Pl.'s Mem., Ex. 8. SPLC earned a total of $565,220.07 from 1787 different D.C. donors in 2008 and $345,012.68 from 1918 different D.C. donors in 2007. Pl.'s Mem., Ex. 9 ("DC Unique Donor and Revenue Count by ZIP"). Over the nine-year period from 2000-2008, SPLC received over $3 million in gift contributions from D.C. donors. *Id.* Donors may contribute online, by mail, or by telephone. *See* Pl.'s Mem., Ex. 10 (Dep. of Wendy Via) at 13. Because it receives donations from the District, SPLC is required by law to have an agent for service of process in D.C. *See* Pl.'s Mem., Ex. 18 (SPLC's Responses to Interrogatories) at 25. In addition, one of SPLC's Board members resides in D.C. *Id.*

SPLC also distributes publications to individuals in the District of Columbia. SPLC publishes *Intelligence Report* each quarter and another magazine called *Teaching Tolerance*. *See* Defs.' Supp. Mem., Ex. 5 (Aff. of Wendy Via) ¶¶ 7-8. These magazines are written in Alabama, published in Georgia, and made available free of charge. *Id.* ¶ 8; Defs.' Mem., Aff. of Teenie Hutchison ¶ 15. During the third quarter of 2009, SPLC distributed 1443 copies of the

*Intelligence Report* to addresses in the District of Columbia. Defs.' Supp. Mem., Ex. 5 (Aff. of Wendy Via) ¶ 7.[2] Between fall 2005 and 2008, SPLC distributed 12,075 copies of *Teaching Tolerance* in the District of Columbia. *Id.* ¶ 8. SPLC has also distributed teaching materials (such as handbooks, videos, and learning kits) to educational institutions in the District of Columbia as part of its "Teaching Tolerance" education program. *Id.* ¶ 9. From 2004 to 2008, SPLC distributed 7187 teaching materials to individuals in the District of Columbia. *Id.* In addition, SPLC awarded two teaching grants to individuals or organizations in the District of Columbia between 2000 and 2008 (out of 1356 such grants awarded nationally). *Id.* ¶ 10.

SPLC staff members have participated in conferences and training programs in the District of Columbia. From 2000 to 2008, SPLC staff participated in four training programs in the District, with approximately 400 people receiving training in three of those programs. *See* Pl.'s Mem., Ex. 12 (SPLC's Responses to Interrogatories) at 24. SPLC has connections with several D.C.-based organizations, and several SPLC staff members have attended conferences or programs in D.C. relating to their work with SPLC. *See* Pl.'s Mem., Exs. 33-53 (Business Expense Vouchers for D.C. trips); *see also* Pl.'s Mem., Ex. 32 (Dep. of Wendy Via) at 43-47 (explaining that she visits D.C. at least once a year to meet with consultants). Some of these meetings have been with governmental entities, but many involve only non-governmental organizations.

SPLC also monitors hate groups in the District of Columbia and solicits information from District of Columbia sources in preparing articles for publication. During jurisdictional

---

[2] SPLC has indicated that it only has records for the third quarter of 2009 with respect to the distribution of *Intelligence Report*. *See* Defs.' Supp. Mem., Ex. 5 (Aff. of Wendy Via) ¶ 7.

discovery, SPLC indicated that it was monitoring eight hate groups located in D.C. *See* Pl.'s Mem., Ex. 20 (Dep. of Mark Potok) at 81-82. On one occasion, SPLC had a reporter attend a meeting of one of these D.C.-based hate groups. *See id.* at 84. SPLC staff members have also contacted D.C.-based organizations to obtain information for SPLC. *See* Pl.'s Mem., Ex. 25 (SPLC's Responses to Interrogatories) at 20 (explaining that SPLC's Director of Research and Special Projects for its Intelligence Project had contacted two D.C.-based organizations by telephone and/or email several times over the years to seek comment for stories that involved them); Pl.'s Mem., Ex. 26 (SPLC's Responses to Interrogatories) at 21 (discussing SPLC contacts with an international relations scholar at American University in D.C. for an article published by SPLC).

       C.      *Holthouse's Connections with the Forum*

Defendant David Holthouse resides in Alabama. *See* Am. Compl. ¶ 15. Between 2000 and 2008, Holthouse visited the District of Columbia on four occasions: once as a presenter at the Association of Alternative Newsweeklies ("AAN") Convention; once for a personal visit with family and friends; once to attend the Conservative Political Action Conference ("CPAC") on assignment for *High Times* magazine for a story; and once to attend a Neo-Nazi immigration rally on assignment for SPLC for a story. *See* Defs.' Supp. Mem., Ex. 1 (Holthouse's Responses to Interrogatories) at 8-9. SPLC paid the expenses for the latter two trips, and the AAN paid for Holthouse's hotel on the first trip. *Id.* at 9. Holthouse has never worked for an organization with an office in D.C. and has never held any assets in D.C. *Id.* at 10.

When researching and preparing for the "State of Denial" article, Holthouse tried unsuccessfully to contact someone at the Institute for Turkish Studies in Washington, D.C. *Id.* at

8

5.  After the "State of Denial" article was published, Holthouse spoke to an individual at the Institute for Turkish Studies about his objections to the piece.  *Id.* at 12.  On a few other occasions, Holthouse interviewed subjects in D.C. for articles.  *See id.* at 5-12.

## III.  DISCUSSION

The question before the Court is whether Defendants' contacts with the District of Columbia are sufficient to enable this Court to exercise personal jurisdiction over them.  The jurisdictional reach of this Court is determined by looking to the District of Columbia long-arm statute and the constitutional requirements of due process.  *See* FED. R. CIV. P. 4(k)(1)(A); *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995).  The D.C. long-arm statute provides in pertinent part:

> (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—
>
> > (1) transacting any business in the District of Columbia;
> > (2) contracting to supply services in the District of Columbia;
> > (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; [or]
> > (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia[.]
> > . . . .
>
> (b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

D.C. CODE § 13-423 (2001).  In this case, Lewy asserts that jurisdiction is proper under subsection (a)(4), which provides specific jurisdiction over non-resident defendants whose tortious acts outside the District of Columbia cause injury within the District if defendants satisfy

one of the three enumerated "plus factors": "regularly do[ing] or solicit[ing] business, engag[ing] in any other persistent course of conduct, or deriv[ing] substantial revenue from goods used or consumed, or services rendered, in the District of Columbia." *Id.* § 13-423(a)(4). In this case, Lewy contends that Defendants' alleged acts of defamation outside the District caused him injury within the District[3] and that Defendants have engaged in a "persistent course of conduct" in the District.

Although § 13-423 requires that the claim asserted by the plaintiff arise from the "acts enumerated in this section," federal courts have long held that the "persistent course of conduct" required for jurisdiction under subsection (a)(4) need not be related to the tortious act outside the forum that causes the injury. *See Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987); *Steinberg v. Int'l Criminal Police Org.*, 672 F.2d 927, 931 (D.C. Cir. 1981). In *Crane*, then-Judge Ruth Bader Ginsburg explained that under subsection (a)(4),

> the act outside/*impact inside* the forum is the basis for drawing the case into the court, but because the harm-generating act (or omission) occurred outside, the statute calls for something more. The "something more" or "plus factor" does not itself supply the basis for the assertion of jurisdiction, but it does serve to filter out cases in which the inforum impact is an isolated event and the defendant otherwise has no, or scant, affiliations with the forum.

*Crane*, 814 F.2d at 763. In a recent decision, the D.C. Court of Appeals explicitly adopted the

---

[3] When a District of Columbia plaintiff is injured by a defamatory article published in and mailed from another state, the tortious act is considered to have occurred outside the District of Columbia and the injury is considered to have occurred inside the District of Columbia. *See McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1300; *Moncrief v. Lexington-Herald-Leader Co.*, 807 F.2d 217, 221 (D.C. Cir. 1986). For that reason, jurisdiction is not proper under subsection (a)(3) (pertaining to tortious acts committed inside the District). Lewy does not argue that his claims arise from Defendants' transacting business in the District, and therefore jurisdiction does not lie under subsection (a)(1). None of the other subsections of D.C. Code § 13-423 are relevant to this action.

*Crane* court's reasoning, holding that the claim need not arise from the "plus factors" imposed by subsection (a)(4). *See Etchebarne-Bourdin v. Radice*, 982 A.2d 752, 763 (D.C. 2009). It is undisputed that Lewy's defamation claims arise out of Defendants' conduct outside the District of Columbia. Therefore, for purposes of the long-arm statute, the Court need only determine whether Defendants have engaged in a "persistent course of conduct" in the District.

Courts have grappled with the question of what number of contacts is necessary to establish a "persistent course of conduct" for purposes of subsection (a)(4). *See Burman v. Phoenix Worldwide Industries, Inc.*, 437 F. Supp. 2d 142, 154 (D.D.C. 2006) (describing a "notable lack" of authority on this issue). In *Crane*, the D.C. Circuit explained that the "persistent course of conduct" plus factor "is satisfied by connections considerably less substantial than those it takes to establish general, all-purpose 'doing business'- or 'presence'-based jurisdiction." 814 F.2d at 763. The D.C. Court of Appeals, adopting the *Crane* court's analysis, explained that "the 'plus factors' that are imposed by subsection (a)(4) . . . are an additional due process safeguard . . . to ensure that the party being haled into this jurisdiction's courts has more than a 'scant' connection to the forum." *Etchebarne-Bourdin*, 982 A.2d at 763. Thus, a defendant's contacts need not be great to satisfy subsection (a)(4); they need only be sufficient to establish a real connection to the District of Columbia such that a party might expect to be subjected to jurisdiction here.[4]

---

[4] There is some conflict among the authorities regarding whether subsection (a)(4) extends personal jurisdiction to the constitutional limits of due process. The *Crane* court noted that the framers of the model legislation from which D.C.'s long-arm statute is derived intended subsection (a)(4) to be more restrictive than the constitutional maximum and suggested that "[subsection] (a)(4) of the D.C. long-arm statute may indeed stop short of the outer limit of the constitutional space." 814 F.2d at 762. At least one court within this Circuit has interpreted § 13-423(a)(4) as "*more* restrictive than the Due Process Clause of the Constitution." *Kopff v.*

The fact that a defendant has directed his conduct toward the District of Columbia is insufficient to establish a "persistent course of conduct" in the District. For example, courts have held that defendants who place telephone calls from another state into the District have not engaged in conduct "in the District," regardless of the nature or frequency of the telephone calls. *Tavoulareas v. Comnas*, 720 F.2d 192, 194 (D.C. Cir. 1983); *see also Burman v. Phoenix Worldwide Indus., Inc.*, 437 F. Supp. 2d 142, 154 (D.D.C. 2006) (holding that approximately 1326 telephone calls to the District does not constitute a "persistent course of conduct"). Occasional travel to the District is also insufficient. *See FINCON Servs.*, 681 F. Supp. 2d at 47-48 (finding that three unsuccessful trips to solicit business in the District did not rise to the requisite level); *Burman*, 437 F. Supp. 2d at 153-54 (finding that attendance by defendants' employees at "continuing education programs, seminars, and conferences" in the District, with no evidence that their attendance was regular or persistent, did not satisfy subsection (a)(4)); *Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd.*, 691 F. Supp. 379, 381 (D.D.C. 1987) (finding that "sporadic attendance at trade association meetings" in the District was insufficient under subsection (a)(4)).

---

*Battaglia*, 425 F. Supp. 2d 76, 82 (D.D.C. 2006). However, there is language in *Etchebarne-Bourdin* that suggests the D.C. Court of Appeals would interpret subsection (a)(4) to the constitutional limit. *See* 982 A.2d at 762 ("This narrow reading of subsection (b)'s nexus requirement as a due process safeguard is consistent with 'Congress's intent to provide the District of Columbia with a long arm statute equivalent in scope to those already in effect in Maryland and Virginia,' the courts of which had interpreted their statutes to 'permit the exercise of personal jurisdiction over nonresident defendants to the extent permitted by the due process clause of the United States Constitution.'" (quoting *Envt'l Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808, 810-11 (D.C. 1976)); *see also Harris v. Omelon*, 985 A.2d 1103, 1105 n.1 (D.C. 2009) ("The District of Columbia's long-arm statute is co-extensive with the reach of personal jurisdiction permitted under the Due Process Clause.") Ultimately, the Court finds that it need not decide this question, and therefore it shall analyze subsection (a)(4) separately from the constitutional requirements.

Defendants who maintain websites accessible to District residents may demonstrate a "persistent course of conduct" if their contacts with the District are substantial enough. For example, in *Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998), the court held that there was jurisdiction over a defendant who had allegedly defamed two White House employees by publishing a story about them on his gossip website, the "Drudge Report." After examining all of the defendant's contacts with the forum, the court held that jurisdiction existed based on: (1) the interactive nature of defendant's website accessible to D.C. residents; (2) the regular distribution of gossip news to D.C. residents by email and related means over the internet; (3) defendant's solicitation and receipt of contributions from D.C. residents ($250 received from 15 D.C. residents); (4) the availability of the website to D.C. residents 24 hours a day; (5) the defendant's travel to the District for an interview on C-SPAN; and (6) defendant's contact with D.C. residents who provide him with gossip for reporting on his website. 992 F. Supp. at 57; *see also Heroes, Inc. v. Heroes Found.*, 958 F. Supp. 1, 5 (D.D.C. 1996) (finding that defendant's website and advertisement in the Washington Post provided a sufficient basis for jurisdiction). The level of interactivity of the website has generally been considered significant in determining whether a website operator is transacting business in the District or otherwise targeting the forum. *See, e.g.*, *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 512-13 & n.5 (D.C. Cir. 2002) (finding that general jurisdiction existed over corporation "doing business" in the District through its website, which enabled D.C. residents to open brokerage accounts, transmit funds electronically, buy and sell securities, and perform other financial transactions). However, courts have generally recognized that maintenance of a website, with nothing more, is not enough to trigger jurisdiction. *See GTE New Media Services Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C.

Cir. 2000) ("[P]ersonal jurisdiction surely cannot be based solely on the ability of District residents to access defendants' websites, for this does not by itself show any persistent course of conduct by the defendants in the District."); *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 121-22 (D.D.C. 2005) (holding that defendants' website, which allowed D.C. residents to make financial donations and provide contact information, was targeted at a local congregation in New Jersey and did not provide a basis for jurisdiction).

District of Columbia courts have also recognized that certain activities which occur in this jurisdiction due its status as the nation's capital should not be considered in the jurisdictional analysis. For example, "this Circuit has consistently held that the business conduct of news gathering organizations within the District cannot be used to establish personal jurisdiction over an out-of-state news agency." *Lohrenz v. Donnelly*, 958 F. Supp. 17, 19 (D.D.C. 1997). Thus, under the so-called "newsgathering exception," the collection of news in the District for dissemination elsewhere does not constitute "business" or a "persistent course of conduct" for the purposes of assessing jurisdiction under the long-arm statute. *See Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217, 222-24 (D.C. Cir.1986). The exception "is intended to protect a newspaper whose only persistent course of conduct in the District is the maintenance of an office there for gathering news from being subject to the jurisdiction of the District's courts." *Id.* at 222. Thus, the prototypical case involving the exception is a newspaper with a negligible District audience that maintains a bureau in the District. *See id.* at 219, 221 (finding the newsgathering exception applied to a Kentucky newspaper with only twenty-two paid mail subscriptions in the District of Columbia that operated an office in the District for the sole purpose of gathering news); *Shirlington Limousine & Transp., Inc. v. San Diego Union-Tribune*,

14

566 F. Supp. 2d 1, 4 (D.D.C. 2008) (finding the court did not have personal jurisdiction over California newspaper whose only persistent course of conduct in the District of Columbia was a news bureau engaged in no functions aside from newsgathering). Courts have also generally held that a defendant's contacts with the United States government do not factor into the personal jurisdiction analysis. *See Crane*, 814 F.2d at 761-62 (citing cases). The so-called "government contacts" exception is intended to (1) protect the right of citizens to freely access and petition the government and (2) prevent the District of Columbia from becoming a national judicial center based solely upon parties' contacts with the federal government. *Envtl. Research Int'l v. Lockwood Greene Eng'rs*, 355 A.2d 808, 813 (D.C. 1976).

With these considerations in mind, the Court shall consider Defendants' contacts with the forum.

### A. SPLC's Contacts with the District of Columbia

Lewy contends that SPLC has maintained a "persistent course of conduct" in the District of Columbia by: (1) maintaining an interactive website available to D.C. residents 24 hours per day through which residents can sign up for information and donate to SPLC; (2) distributing its *Teaching Tolerance* and *Intelligence Report* magazines to D.C. residents through the mail; (3) soliciting and receiving millions of dollars in donations from D.C. residents by mail, phone, and over the internet; (4) sending its employees to the District for training sessions and conferences; (5) monitoring hate groups in the District of Columbia; and (6) gathering information from sources in the District of Columbia for its publications. SPLC contends that these contacts do not amount to a "persistent course of conduct" and that the Court "cannot simply aggregate all of SPLC's contacts in the District" as evidence of specific jurisdiction under subsection (a)(4). *See*

Defs.' Supp. Mem. at 5. However, the case cited by Defendants for this non-aggregation proposition, *Savage v. Bioport, Inc.*, 460 F. Supp. 2d 55 (D.D.C. 2006), is inapposite because it involved the connection between defendant's contacts and the claim asserted under the "transacting any business" prong under subsection (a)(1). *See* 460 F. Supp. 2d at 59-61. Courts have routinely considered the totality of defendants' contacts in assessing the "plus factors" of subsection (a)(4). *See, e.g.*, *Blumenthal*, 992 F. Supp. at 57 (considering all of defendant's contacts with the forum); *Burman*, 437 F. Supp. 2d at 153-56 (same).

Based on a careful consideration of the relevant precedents and all of the jurisdictional facts, the Court finds that SPLC has engaged in a persistent course of conduct in the District of Columbia sufficient to establish personal jurisdiction under subsection (a)(4). During the years leading up to the publication of the "State of Denial" article, SPLC created a network of contacts in the District of Columbia through its website and other means to distribute thousands of copies of its magazines and solicit millions of dollars in donations to support its operations. SPLC also sent its employees to the District of Columbia for training programs and conferences[5] and collected information on hate groups in the District of Columbia. These contacts are similar to those the Court found sufficient in *Blumenthal*; in fact, SPLC's contacts with the District are much more extensive than the defendant in *Blumenthal* because it has a much larger network of D.C. residents who contribute money and receive publications and does not rely solely on its website to distribute its materials.

SPLC argues that its efforts to monitor hate groups in the District and collect other

---

[5] Because of the "government contacts" exception, the Court does not consider visits made by SPLC employees for the purpose of meeting with federal government officials. The facts show that SPLC employees often traveled to meet with nongovernmental organizations.

information from sources in the District should be excluded from the analysis under the "newsgathering exception." However, that exception is intended to protect news organizations who cover national news for a local audience outside the District. *See Moncrief*, 807 F.2d at 222 ("[W]hat is being protected by the newsgathering exemption is the right of *subscribers* within the area of immediate circulation of a newspaper or magazine to receive news of national interest which must be gathered in the District of Columbia." (citation and quotation marks omitted)). By contrast, SPLC's newsgathering efforts (to the extent they can be characterized as such[6]) are aimed at a national audience that includes D.C. residents. Therefore, the Court may consider contacts such as SPLC's sending Holthouse to attend a Neo-Nazi rally in the District as part of a "persistent course of conduct" for purposes of subsection (a)(4). The Court notes, however, that these limited "newsgathering" contacts are not determinative of the Court's conclusion that jurisdiction exists; SPLC's numerous other contacts with the District would create jurisdiction even if the "newsgathering exception" did apply.

SPLC also argues that the distribution of magazines and other materials to D.C. residents cannot be considered conduct "in the District" because under the law of defamation, the defamatory "act" is the initial publication of the statement, which occurred outside the District, and not its subsequent circulation. *See Moncrief*, 807 F.2d at 220-21. However, as explained above, subsection (a)(4) does not require a nexus between the "persistent course of conduct" and the tortious act occurring outside the District that gives rise to jurisdiction. Therefore, the

_____

[6] Lewy argues that SPLC's research for quarterly publications such as *Intelligence Report* does not qualify as "newsgathering" because, in the age of 24-hour news cycles, the information published in the magazine is too old to be "news." *See* Pl.'s Reply at 7-8. The Court need not adopt Lewy's narrow definition of news to find that the newsgathering exception does not apply.

circulation of materials to D.C. residents may be considered separately from the alleged

defamatory conduct.  Although Defendants have cited several cases involving the circulation of

allegedly defamatory materials in the District, none of the cases cited held that circulation of

materials could not amount to a "persistent course of conduct" under subsection (a)(4).  For

example, in *Moncrief*, the court held that there was no jurisdiction under subsection (a)(4)

because the only alleged "persistent course of conduct" in the District was the defendant

newspaper's maintenance of an office here, and that contact was subject to the "newsgathering

exception"; the court, perhaps understandably, did not consider whether the newspaper's twenty-

two paid mail subscriptions in the District (amounting to $3000 per year in revenue) might

provide a basis for jurisdiction.  *See* 807 F.2d at 218-19, 221-22.  In *McFarlane v. Esquire*

*Magazine*, the court held that the defendant's sale of two articles to D.C.-based publications

during his entire journalism career did not qualify as a "persistent" course of conduct.  *See* 74

F.3d at 1300-01.[7]  SPLC's distribution of magazines indicates a relationship with its D.C.

subscribers that is far more extensive than the telephone calls that have been rejected as out-of-

forum conduct for purposes of subsection (a)(4).  *Cf. Blumenthal*, 992 F. Supp. at 57 (finding that

regular distribution of newsletter by email to D.C. residents supports jurisdiction under

subsection (a)(4)).  SPLC argues that its circulation to D.C. residents is only a small fraction of

---

[7] Defendants also cite *Reuber v. United States*, 750 F.2d 1039 (D.C. Cir. 1984), *overruled on other grounds by Kaufmann v. Anglo-Am. Sch. of Sofia*, 28 F.3d 1223 (D.C. Cir. 1994), in which the court found there was no jurisdiction over a defendant whose allegedly defamatory letter was eventually distributed in the District.  *See* 750 F.2d at 1050.  However, the *Reuber* court found that the plaintiff had failed to make an argument based on subsection (a)(4) before the district court and that there was no factual basis in the record for making one.  And in *La Pointe v. Van Note*, No. 03-2128, 2004 WL 3609346 (D.D.C. 2004), also cited by Defendants, the court found that the plaintiff had failed to assert which facts demonstrated a "persistent course of conduct" and ultimately rejected the plaintiff's conspiracy theory of jurisdiction.

its nationwide circulation. *See* Defs.' Supp. Mem. at 10-11. But the Court must consider SPLC's contacts with this forum in absolute terms, without regard to whether jurisdiction might lie elsewhere.

SPLC also argues that its fundraising activities in the District are not substantial enough to warrant jurisdiction under subsection (a)(4). SPLC relies on *Burman v. Phoenix Worldwide Industries, Inc.*, in which the court found that the defendant company's receipt of $30,000 in revenue from contracts with seven D.C. clients did not constitute "substantial revenue" as defined in subsection (a)(4). *See* 437 F. Supp. 2d at 155. However, the *Burman* court found that "the quality and nature of [the defendant's] contacts represent a negligible relationship with this forum" because the services provided to D.C. clients arose out of the defendant's presence in Florida and there was no continuing course of conduct directed at the District. *Id.* at 155-56. By contrast, SPLC directly targets D.C. residents through its solicitation program and has raised over $3 million from them in the last decade. The fact that SPLC may do the same in other states does not detract from its course of conduct here.[8]

In sum, the Court finds that SPLC has engaged in a "persistent course of conduct" in the District of Columbia by maintaining a website that D.C. residents use to interact with SPLC, regularly distributing publications to hundreds of D.C. residents over the internet and through the mail, soliciting millions of dollars in donations from D.C. residents through various means, sending employees to the District for conferences and meetings with nongovernmental organizations, and collecting information in the District for its website and national publications.

---

[8] Defendants' reliance on *Hughes v. A.H. Robins Co.*, 490 A.2d 1140 (D.C. 1985), is inapposite because that case did not involve the application of the District of Columbia's long-arm statute.

Therefore, SPLC is amenable to suit under D.C. Code § 13-423(a)(4).

However, before this Court can exercise jurisdiction over SPLC, it must find that doing so would not offend "traditional notions of fair play and substantial justice" as required by the constitution's guarantee of due process. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). "There are no 'mechanical tests' or 'talismanic formulas' used by courts to determine whether the assertion of personal jurisdiction is appropriate in a particular case." *Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.*, 607 F. Supp. 2d 185, 189 (D.D.C. 2009) (quoting *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 329 (D.C. 2000)). In weighing defendants' various contacts, the Court must consider whether "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

The Supreme Court has held that a defendant's "regular circulation of magazines in the forum State is sufficient to support an assertion of jurisdiction in a libel action based on the contents of the magazine." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 773-74 (1984). The Supreme Court has also held that a court may exercise personal jurisdiction over an out-of-state defendant who knowingly causes injury in the forum through intentional tortious conduct. *See Calder v. Jones*, 465 U.S. 783, 789-91 (1984) (holding that a California court could exercise jurisdiction over the nonresident author and editor of a defamatory article whose alleged wrongdoing was "intentionally directed at a California resident"). Here, the evidence shows that in 2009, SPLC distributed over a thousand copies of the *Intelligence Report* to D.C. residents, and SPLC's alleged defamation was directed at Lewy, a D.C. resident. Based on these facts and SPLC's numerous other contacts with the District, SPLC could reasonably anticipate being

subject to jurisdiction in a District of Columbia court.  Therefore, the exercise of jurisdiction over SPLC comports with the constitutional requirements of due process.

Because jurisdiction is proper under the constitution and D.C.'s long-arm statute, the Court shall deny Defendants' motion to dismiss with respect to SPLC.

> B.        *Holthouse's Contacts with the District of Columbia*

Although the Court has concluded that it has personal jurisdiction over SPLC, the Court must determine separately whether Defendant Holthouse has engaged in a "persistent course of conduct" in the District.  "[A]s a general rule, courts cannot exert jursidiction over individual corporate officers or employees 'just because the court has jurisdiction over the corporation.'" *Kopff v. Battaglia*, 425 F. Supp. 2d 76, 84 (D.D.C. 2006) (quoting *Flocco v. State Farm Mut. Auto. Ins. Co.*, 752 A.2d 147, 162 (D.C. 2000).  Moreover, the D.C. Circuit has recognized that the jurisdictional contacts for the author of a defamatory article must go beyond the alleged defamatory conduct.  *See McFarlane*, 74 F.3d at 1300 ("*[W]riting* an article for a publication that is circulated throughout the nation, including the District, hardly constitutes doing or soliciting business, or engaging in a persistent course of conduct, *within* the District.")

Here, Lewy has provided evidence demonstrating that Holthouse has the following connections to the District of Columbia: (1) during the course of researching "State of Denial," he made a telephone call to an individual in the District; (2) he has occasionally written articles for national publications that are distributed in the District; (3) and he traveled to the District four times between 2000 and 2008.  As explained above, the telephone call (which was unreturned prior to the publication of "State of Denial") does not count in the jurisdictional analysis because it is not considered activity within the District.  The handful of articles that Lewy has written that

were distributed in the District do not amount to a "persistent" course of conduct. *See* *McFarlane*, 74 F.3d at 1301. Similarly, Holthouse's travel to the District is too infrequent to provide a basis for jurisdiction.

Lewy concedes that "Defendant Holthouse's jurisdictional contacts with the District of Columbia under subsection (a)(4) are substantially less than SPLC's" and argues that "considerations of judicial efficiency militate in favor of litigating Plaintiff's entire defamation case in the District of Columbia." Pl.'s Reply at 17. However, the Court cannot exercise jurisdiction over a defendant based on considerations of judicial efficiency. The Court finds that Defendant Holthouse has not engaged in a "persistent course of conduct" in the District of Columbia and therefore jurisdiction is not proper under D.C. Code § 13-423(a)(4). Accordingly, the Court shall grant Defendants' motion to dismiss with respect to Defendant Holthouse.

## IV. CONCLUSION

For the foregoing reasons, the Court shall GRANT-IN-PART Defendants' [7] Motion to Dismiss with respect to Defendant Holthouse and DENY-IN-PART with respect to Defendant SPLC. An appropriate Order accompanies this Memorandum Opinion.


  */s/*
  **COLLEEN KOLLAR-KOTELLY**
  United States District Judge

22